IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA )
)
)
v. ) Case No.
) 3:18-cr-00146
ANDREW LONG RYAN )
) CHIEF JUDGE CRENSHAW
)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.

EXCERPTS OF PROCEEDINGS:
LEA ANN PRESTON BAECHT, Ph.D. ABPP

January 29, 2020

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:

For the Plaintiff: Mr. J. Benjamin Schrader
110 Ninth Avenue S., Suite A961
Nashville, Tennessee 37203

For the Defendant: Mr. Andrew C. Brandon
810 Broadway, Suite 200
Nashville, Tennessee 37203

PREPARED BY:
LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter
801 Broadway, Room A839
Nashville, TN 37203
lise_matthews@tnmd.uscourts.gov

The above-styled cause came on to be heard on January 29, 2020, before the Honorable Waverly D. Crenshaw, Jr., Chief District Judge, when the following excerpted proceedings were had, to-wit:

(Proceedings excerpted from the testimony of LEA ANN PRESTON BAECHT, Ph.D. ABPP):

THE COURT: And based on what you know about Mr. Bryant -- I'm sorry -- Mr. Ryan, do you think he would be a danger to others outside of a correctional facility?

THE WITNESS: I have not conducted a risk assessment on him. So it would be premature for me to say what the opinion would be. But I can tell you that our process is, we have a panel of doctors, a psychiatrist, psychologist, and social worker, who review their history, speak to them, and then form an opinion on their level of risk. So it's certainly possible that they would conclude that he poses a danger to others if released to the community, but that risk assessment has not been done at this point, given that we're not at that stage in his case.

THE COURT: And based on your dealing with Mr. Ryan -- I won't hold you to your opinion -- what do you think?

THE WITNESS: I think he has some risk factors

that the committee would have to consider, such as there's in the record that he's been involuntarily committed in the past, that he's had weapons in the past, and that he's made threats in the past. That being said, again, they would make that determination. The panel -- the risk assessment panel would make that determination after reviewing all of those records and interviewing him, and then forming the opinion at that moment.

(End of excerpt.)

(Proceedings excerpted from the testimony of LEA ANN PRESTON BAECHT, Ph.D. ABPP):

BY MR. BRANDON:
Q. So he's writing this Facebook post after he has been formally diagnosed with Schizophrenia?
A. Correct.
Q. Which is a chronic, incurable condition, right?
A. That is correct.
Q. And it doesn't -- it doesn't get better without medication?
A. Correct.
Q. So the May 28th post starts, quote: This is one of those messages where I started talking and God took over. Read it. It may not make sense now, but it will soon.

A. That's correct.
Q. And that's pretty consistent with the religious ideation that we've been discussing?
A. Yes, it is.
Q. Grandiose, delusional ideation, I believe is the term.
Right?
A. Correct.
Q. And the part about the plan that doesn't make sense now but soon will is a lot like when he told you that he had special knowledge that would blow your mind, right?
A. It is. Yes.
Q. And then the message says he's "warned the President of the United States of death if he does not comply with a directive I have given him." And it goes on to talk about contacting federal agents for weeks and the unique position that he's in?
A. Correct.
Q. And that's pretty consistent with what you've observed where -- where he keeps saying that he's working with the FBI or the Secret Service, right?
A. Correct.
Q. He's got some sort of special position that allows him to say these things?
A. That's correct.
Q. And do you see the part in all caps where it says -- it

says: "Me making a paint to mucks times for more mind mind raw mind and mine up down same we after leaving death," et cetera?
A. I do.
Q. And do you agree with me that this appears consistent with the word puzzles and nonsensical phases that you described?
A. I do agree with you on that. Yes.
Q. And if you go to the very end of the paragraph, it -- he sort of signs off as -- as capital E, capital L, space, O-N?
A. That's correct.
Q. And do you agree with me that that's consistent with the sort of mystical names that Mr. Ryan used for himself?
A. Yes.
Q. And then if you look at paragraph 7, which describes a May 29th, 2018, Facebook post. And that's -- that's just one day after May 28th, right?
A. Correct.
Q. Okay. And here he says: "This will all make sense soon."
    Right?
A. That's correct.
Q. And that's similar to what we've talked about, about special knowledge that other people don't have?
A. Correct.

Q. He says: "Think of me as a pop up ad for life in an app that needs updating."

Right?

A. Correct.

Q. And "I'm swatted away and ignored, but you won't be able to ignore me soon."

Right?

A. Correct.

Q. And that's a little ominous, right?

A. (Indicating.)

Q. But it's similarly grandiose and delusional, right?

A. It is. Yes.

Q. And then if we look at paragraph 8, which is another May 29th message, the second sentence says, "I'm a warning siren and those who cry the loudest know what I'm talking about."

Right?

A. Correct.

Q. And once again, that looks a bit like a grandiose delusion, right?

A. It's consistent with it, yes.

Q. And the last sentence: "Death is coming," could also be interpreted as grandiose, right?

A. Yes. Potentially.

Q. Just suggests he's sort of in control of these events or has special knowledge about them, right?

A. Correct.
Q. And then finally, if we look at paragraph 9, we see a Twitter post. And it says, "I will kill Donald Trump if you don't follow my leader's lead."
Right?
A. Correct.
Q. And once again we have this idea that he's in on some sort of secret plan.
Right?
A. Yes. He's referring to "my leader" without saying who it is.
Q. Right. Right. And -- and he has great power that's sort of divine of some sort?
A. Presumably, yes.
Q. Right. And if you put all of these messages together, do you agree with me that they're pretty much 100 percent consistent with your diagnosis?
A. Yes, I do.
Q. And, in fact, he had already been diagnosed with Schizophrenia before these messages?
A. Correct.
Q. Is it safe to conclude that these messages are sort of part and parcel with his illness?
A. I think they reflect his thought process and his mental illness, yes.

Q. They're -- they're symptomatic of Schizoaffective Disorder?
A. They're consistent with it, yes.
Q. And -- and they're -- they're, you know, several months after he's alr- -- certain incidents that you used to sort of reach your conclusion about Schizoaffective Disorder, right?
A. Correct.

(End of excerpt.)

REPORTER'S CERTIFICATE

I, Lise S. Matthews, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the Stenograph machine the excerpted proceedings held in open court on January 29, 2020, in the matter of UNITED STATES OF AMERICA v. ANDREW LONG RYAN, Case No. 3:18-cr-00146; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (pages 1 through 8) is a true and accurate record of said proceedings.

This the 27th day of February, 2020.

/s/ Lise S. Matthews
LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter